MEMORANDUM OF DECISION
On December 22, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Kelli J. DeB. to her two children. It also filed petitions as the biological fathers, Steven J., Sr., the father of Steven J., Jr. and Thomas DeB., the father of Thomas DeB., Jr. Neglect petitions had previously been filed on May 19, 1998, at the time the order of temporary custody removing the children from their parents was granted. (Goldstein, J.) The petitions were amended on October 5, 1999, when the termination petition concerning the youngest child, Taylor DeB. was filed. A neglect petition had been filed concerning Taylor on May 19, 1998, at the time of the orders of temporary custody. All matters were consolidated for trial.
On April 5, 2000, Kelli DeB. consented to the termination of her parental rights. The court found her consent to have been knowingly and voluntarily made, with the advice of competent counsel and accepted the consent. (Quinn, J.) The petitions were amended to reflect her consent. The termination petition as to the father, Steven J., Sr., alleges that he has failed to rehabilitate so that he could parent his biological son, who was adjudicated neglected in prior proceedings. Further, as to CT Page 8399 Thomas DeB., the petitions allege that he has abandoned his two children, has failed to rehabilitate, and has no ongoing parent-child relationship with them. Connecticut General Statutes § 17a-112
(c)(3)(A), (B) and (D). The pending neglect petitions all allege that the children are being denied proper care and attention, physically, educationally, emotionally or morally by their biological parents.
The trial on the termination petitions took place on June 6, 2000. Neither Steven J. nor Thomas DeB. attended the trial. At that time, the court also heard a motion filed by the paternal grandmother of the two youngest children to intervene and to be heard with respect to the disposition of this matter. For the reasons set forth below, the court denies the grandmother's motion. The court also adjudicates the children neglected and finds the grounds for termination of parental rights have been proven by clear and convincing evidence. The court finds that it is in the best interests of the three children to terminate their biological parents' rights to them and terminations are ordered.
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Steven J., the father of Steven J., Jr.
Steven J. is now thirty-two years old. He did not graduate from high school and has been involved with the criminal justice system for various crimes since he was seventeen years old. Since that age, he has abused alcohol and cocaine and has not dealt with his addictions successfully. When he was twenty-three, he married Kelli and their son Steven was born on August 25, 1992. He was subsequently divorced from Kelli and has spent significant periods of time since then incarcerated. His arrest record[2]
shows that he is a convicted felon with convictions for assault in the 2nd degree, violation of a protective order, assault in the 3rd degree as well as disorderly conduct. During the time of his relationship with Kelli, he and she engaged in domestic violence and some of his criminal convictions arise from those events.
DCF first became involved with this family in 1993, when Steven, Jr. was brought to the hospital with a broken femur when he was just seven months old. Services were offered to Kelli at that time. Steven J. was not actively involved with his son and by 1995 had ended his relationship with the child's mother, Kelli. The next months and years were characterized by his fitful and marginal attendance at various drug and alcohol treatment programs, from which without exception he was discharged for failing to attend and participate. The social study and addendum catalogue an heroic effort on the part of the Department as well CT Page 8400 as the State Probation Department to provide services to him, while he was bent on continuing to lead a drug-addicted, destructive life. Services were offered for literally years after it was obvious that he had not demonstrated any desire to benefit from them.
On June 13, 1996, Steven signed a service agreement with DCF stating that he would visit his child, not reside in the home with the child, participate in a substance abuse evaluation and follow the recommendations for treatment. He was also required to attend a domestic violence and anger management counseling program. At that time, he began treatment at SCAAD for substance abuse and remained only four days. On August 6, 1996, when his son was adjudicated neglected, the court ordered expectations setting forth similar requirements for him including no further involvement with the criminal justice system as well as to continue with his treatment programs. The evidence is overwhelming that he failed to comply with the terms of the service agreement and the subsequent expectations.
On March 3, 1997, he signed a second service agreement for counseling regarding domestic violence, individual counseling and random urine testing. Again, he failed to comply. By July, 1997, he informed DCF that he had unilaterally ended his substance abuse treatment prior to its completion. As a result, DCF terminated his supervised visitation with his son. On May 19, 1998, there were new court expectations ordered for Steven, requiring the same steps as before. Again, Steven was referred to SCAAD for inpatient treatment and following this to the CVH program. He did not comply with any of these referrals.
The court finds that Steven J., Sr. took no steps to rehabilitate himself so that he could parent his son. Given his behavior, his criminal conduct and his ongoing drug addiction, the court finds, from the clear and convincing evidence, that it is extremely unlikely that he will do so in the future. This is all the more unfortunate because the court-appointed psychologist found that he had a "pleasant and warm relationship" with his son. She noted that he possessed remarkable parenting skills, patience and love for his son."[3] His feelings for his biological son, however, have not been adequate to assist him in overcoming his other significant life difficulties.
2. Thomas DeB., the father of Thomas and Taylor.
Thomas DeB. unfortunately has many of the same problems as Steven J. Thomas is now thirty-three years old and also did not complete his high school education. He began his antisocial behavior early, at age thirteen, and has a lengthy criminal history. He has been incarcerated intermittently throughout most of his children's lives. In February, CT Page 8401 1996, he married Kelli, despite the fact that there were protective orders outstanding prohibiting contact between the two, as a result of domestic violence between them.
On April 30, 1996, he received court expectations that required him to visit his children, to undergo substance abuse evaluation and treatment, to participate in counseling, deal with domestic violence, submit to random urine screens, and to no further involvement with the criminal justice system. He did not comply with the expectations set for him. There were several referrals made for substance abuse assessment. Thomas failed to attend the scheduled assessment meetings. He did not visit with his children regularly and did not inquire about their welfare. Of the thirty-three visits available to him from 1997 to 1998, he attended eighteen. When the second neglect petitions were filed when the children were removed form their mother in May, 1998, additional expectations were set for Thomas, similar in all respects to the earlier orders. Again, he did not comply with them. He last saw his children on October 14, 1998. His last contact with DCF took place on October 24, 1998. He also has not maintained stable housing or income. His plan for the children is to have his mother care for them, as he does not see himself as their primary caretaker.
3. The three children, Steven, Thomas and Taylor.
(a) Steven
Steven is now almost eight years old. His birth date is August 25, 1992. He was first removed from his mother's care in 1996, due to her drug abuse and mental health problems. He was then returned to her briefly and then placed with his paternal grandparents. After a short period of time, he again lived with his mother for another year and then was removed again when his younger siblings were also removed from her on May 15, 1998. He has remained in foster care since that time.
Because of Steven's age and his mother's difficulties, he became a caretaker for his younger siblings while in her care. As a result, he is sometimes old beyond his years or "parentified." He also has an attention deficit disorder diagnosis and receives medication to assist him in school. He has received and continues to receive counseling to address these issues. At the present time he is doing well. Earlier, he had some difficulties with ear infections, which required surgery. After residing with another foster family, in January, 2000 he was placed in a home where his two younger siblings joined him a month later. He has done well in this placement. The foster family has responded to all three children and their special needs and is prepared to adopt them, should they be available for adoption. CT Page 8402
(b) Thomas
Thomas is now over four years old and is also a special needs child. He has significant delays in speech, adaptive skills and gross motor control. He suffers from De Morsier Syndrome, which affects the optic nerve. He is legally blind in his left eye and wears a patch to assist with his other vision problems. He receives services from an agency for the blind. He is also small for his age and his problems are connected to his mother's alcohol consumption while he was in utero. He has a good relationship with his older brother and younger sister and is doing well in his present foster home.
(c) Taylor
Taylor is the youngest of these three children. She is three and her fourth birthday is on October 27, 2000. She has some difficulty with walking on her toes a great deal and is receiving treatment for this. She, like her siblings, has done well in her new foster home.
 B. NEGLECT ADJUDICATION
The first matters to be considered by the court are the pending neglect petitions for all three children. In hearing coterminous petitions for neglect and termination, the court "first adjudicates whether there is neglect. Only when a finding of neglect is made does the court move on to the dispositional phase of the neglect petition. Disposition in a neglect petition may take one of a number of forms, including return to parent, return to parents with a protective order, foster care placement or the initiation of proceedings to terminate parental rights." In re JuvenileAppeal (84-AB), 192 Conn. 254, 261, 446 A.2d 808, (1984). (Internal citations omitted.) The standard of proof in the neglect phase is by a fair preponderance of the evidence and in the termination phase, if reached, by clear and convincing evidence, a more stringent requirement. Connecticut Practice Book (Rev. 1998) § 33.12, Connecticut General Statutes § 17a-112 (b).
In accordance with the statutory requirements and the case law, the court finds by a fair preponderance of the evidence that the biological parents have neglected their children, Steven J., Jr., Thomas DeB., Jr., ad Taylor DeB., pursuant to Connecticut General Statutes § 46b-120
(8)(B) and (C). Because of the drug use of the biological mother and both biological fathers, the three children had been denied proper care and attention, physically, educationally or morally. The court adjudicates them neglected children. CT Page 8403
 C. ADJUDICATORY TERMINATION FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . ." Connecticut General Statutes § 17a-112 (c)(1). DCF does allege that Thomas DeB. is unable or unwilling to benefit from such services. The court finds, based on the clear and convincing evidence that Thomas was unable to benefit from such efforts as of the effective adjudicatory date, October 5, 1999.[4] The court also finds that DCF made reasonable reunification efforts and referrals to services to benefit him.
No such allegation was made as to Steven J., Sr. The court has noted the many referrals for substance abuse treatment and other programs offered to him. The court finds that these services were suited to his needs and that they were reasonable. As stated, they continued for a considerable period of time, during which Steven did not demonstrate any progress. In particular, he was never able to address his use of illegal substances. The court finds, from the clear and convincing evidence, that DCF made more than reasonable efforts to reunify him with his son.
2. Steven J.'s Failure to Rehabilitate.
The court further finds, by clear and convincing evidence, that as of the adjudicatory date, Steven J. had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of his child, he could assume a responsible position in his life. "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role — as a parent." In re MigdaliaM., 6 Conn. App. 194, 203, 504 A.2d 532 (1986), see also In re JuvenileAppeal, 1 Conn. App. 463, 477, 473 A.2d 795 (1984). Steven was unable to deal with his addiction and has not rehabilitated himself so that he can parent a child.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989), In reHector L., 53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petition, the court CT Page 8404 must consider not only Steven's conduct prior to the filing of those petitions, but also his conduct since that time. Despite his ability to relate to his son, Steven has again relapsed. The court concludes from the evidence that Steven was still actively engaged in using illegal substances within the past year. Given his history and pattern of conduct, the court concludes that he cannot be rehabilitated as a parent of this child within the reasonably foreseeable future, consistent with this child's needs for permanency.
3. The Allegations against Thomas DeB.
The first ground alleged against Thomas DeB. is that he has abandoned his children. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14,438 A.2d 801 (1981). Thomas was never actively involved with his children. He has only rudimentary parenting skills, the court-appointed psychologist found upon evaluation. He has not visited regularly and has not inquired about the welfare of his children. He has not seen them for almost two years. The court finds, from the clear and convincing evidence, that he has abandoned them in the legal meaning of the term.
The second allegation is that Thomas DeB. has failed to rehabilitate so that he could parent his children. The court concludes that this ground has also been proven by clear and convincing evidence. As noted, Thomas has been unable to deal with his drug addiction. He continues to engage in criminal activity. He has no stable housing or income and has no ability to care for his two children. Given his past behavior, there is no reason to believe that his behavior will change in the future. Both Thomas, Jr. and Taylor require permanency and stability in their lives, which their biological father cannot provide them.
The third ground for termination of Thomas DeB.'s parental rights is his failure to have an ongoing parent-child relationship with his children. To succeed on this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Statutes § 17a-112
(c)(3)(D); In re Savanna M., 55 Conn. App. 807, 815, 740 A.2d 484
(1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite — its former existence it has now CT Page 8405 been completely displaced." In re Juvenile Appeal (Anonymous),181 Conn. 638, 645, 436 A.2d 290 (1980) (internal citations omitted). While Thomas Jr. knows his father and Taylor appears to have some idea of who he is, there is no warm and nurturing relationship between the children and their biological father. The children look to their foster parents to care for them. To wait for more time to pass in order to develop such a relationship when Thomas DeB. has not sought to change his life to accommodate his children, is detrimental to the children. The court concludes from the clear and convincing evidence that there is no ongoing parent-child relationship between Thomas DeB. and his two children.
 D. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
(1) Appropriate and timely services were provided by DCF to the family. These included services to benefit the children, referrals for both Steven J. and Thomas DeB. to deal with issues of domestic violence, anger management and substance abuse. DCF also provided visitation and case management services.
2) As previously noted, the court finds by clear and convincing evidence that Thomas DeB. was both unwilling and unable to benefit from reunification services. Reasonable services were provided to Steven J.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable service agreements and court expectations were set for these biological fathers and that neither was minimally able to fulfill them.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. While none of the children has yet been in their present foster home for one year, they view their foster family as their own. Steven., Jr. knows his mother and father cannot care for him. The younger children do not speak of either of their biological parents.
5) Finding regarding the ages of the children: Steven will be eight on August 25, 2000, Thomas is four and Taylor is three years old.
6) Finding regarding efforts of the parents to adjust their CT Page 8406 circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of these children.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children or the unreasonable act of any other person or by the economic circumstances of the parents. No such conduct is noted. DCF took steps for many years to assist this family.
 E. DISPOSITION 1. The Paternal Grandmother's motion to intervene
The grandmother of the two youngest children filed a motion to intervene and to present information to the court regarding the disposition of this matter. Specifically, although she did not seek placement of the children with her, she wished to have continued visitation with her grandchildren. It is presently DCF's plan to continue to permit visitation of all the grandparents of the three children, as they have visited in the past. The court hopes, given the children's knowledge of their grandparents, that such visitation, consistent with their best interests, will continue.
However, in considering the appropriate disposition in a termination of parental rights case, any visitation order would be inconsistent with the judgment being sought. The purpose of a termination judgment is to vest legal authority over the children with the statutory parent, adoptive parents or the guardians and to grant such entities or individuals the right to make decisions about the children's future life and their contact with others. As reflected in the language of Connecticut General Statutes § 46b-59, when parental rights or adoption are being considered by a court of competent jurisdiction, termination of visitation orders issued under that statute may also be ordered. Our Appellate court has also held where an intervening grandmother in a termination of parental rights case sought more time to establish a relationship with her grandchild in order that he could be placed with her: CT Page 8407
 "The purpose of the intervention of a grandparent in a termination of parental rights case does not include the right to effect an adoption or to obtain custody for the grandparent but is solely for the purpose of affecting the termination itself." In re Denzel A., 53 Conn. App. 827, 834, 733 A.2d 298 (1999).
For all the foregoing reasons, the court denies the paternal grandmother's motion for visitation as such an order is inconsistent with the nature of the proceedings before the court.
2. The Best Interests of the Children.
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the children at issue. As has been noted:
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that all grounds for termination of the parental rights of the biological fathers of the children have been proven by clear and convincing evidence. The children's mother has consented to the termination of her parental rights. The court has made the seven statutory findings required, which all weigh in favor of termination being in these children's best interests.
The court concludes, from the clear and convincing evidence, that there is no biological parent who will be able to care for these children. The court further concludes, from the clear and convincing testimony, that all three children require permanency and stability in their lives. Permanent placement or adoption by a family that understands and can CT Page 8408 accommodate their special needs is the avenue most likely to accomplish permanency for them. Fortunately, the children are with a foster family who wishes to adopt them and provide such permanent nurturing care for them. The court finds that termination of their parents's rights to them is in the best interests of Steven J., Jr., Thomas DeB., Jr. and Taylor DeB.
Based on the foregoing, the court orders a termination of the parental rights of Kelli J. DeB. to her three children. The court also orders the termination of the parental rights of Steven J. to his biological son, Steven J., Jr. and those of Thomas DeB. to Thomas DeB., Jr. and Taylor DeB. The Commissioner of the Department of Children and Families is hereby appointed the children's statutory parent. The court further directs DCF to give the foster family first consideration in adopting these children. The court also orders that a permanency plan for these terminated children be submitted within sixty days. A review plan for them shall be filed in accordance with state and federal law.
 Barbara M. Quinn, Presiding Judge Child Protection Session